IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 14-cv-00158-RBJ

JIMMY A. VALDEZ,

        Plaintiff,

v.

ANDREW M. SAUL, Commissioner of Social Security,

        Defendant.

---

ORDER

---

This matter is before the Court on review of the Social Security Administration ("SSA")

Commissioner's decision denying claimant Jimmy A. Valdez's application for Social Security

Disability Insurance ("SSDI") and Supplemental Security Income ("SSI").  Jurisdiction is proper

under 42 U.S.C. § 405(g).  For the reasons explained below, the Court reverses the

Commissioner's decision and remands the case for further consideration.

**STANDARD OF REVIEW**

A person is disabled within the meaning of the Social Security Act only if her physical

and/or mental impairments preclude her from performing both her previous work and any other

"substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2).  To be

disabling, a claimant's conditions must be so limiting as to preclude any substantial gainful work

for at least twelve consecutive months.  *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

1

This appeal is based upon the administrative record and the parties' briefs.  In reviewing a final SSA decision, the district court examines the record and determines whether it contains substantial evidence to support the decision and whether SSA applied correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).  The district court's determination of whether the ruling by the Administrative Law Judge ("ALJ") is supported by substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988).  Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Reversal may also be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed. *Winfrey*, 92 F.3d at 1019.

## BACKGROUND

### A. Factual Background

Jimmy Valdez alleges he was 43 when he became disabled due to diabetes mellitus with peripheral neuropathy, peripheral vascular disease, and obesity.  ECF No. 25 at vviii–vvix.  Mr. Valdez was able to return to work shortly before his fiftieth birthday. *Id.* at ix.  Prior to the onset of his disability, Mr. Valdez had worked as a loader operator, warehouse worker, roofer's helper, and construction laborer. *Id.*

In 2006 Mr. Valdez began seeing Dr. Robert Alsever, M.D. for management of his diabetes.  R. 689; 703; 705; 706; 707.  On July 11, 2006 Dr. Alsever noted that Mr. Valdez was "very limited in the kind of work he can do.  His work should not include a great deal of

bending, orthostatic changes, and should be sitting." R. 689. Dr. Alsever opined that Mr.

Valdez was "extremely compromised" in his ability to work. *Id.* Dr. Alsever also completed a

disability questionnaire, opining that Mr. Valdez could sit for two hours at a time, could

stand/walk for less than two hours per day, needed to take unscheduled breaks almost daily to lie

down for one to two hours, and was likely to be absent from work for more than four days per

month. R. 685–88. Dr. Alsever believed Mr. Valdez could lift ten pounds frequently and twenty

pounds occasionally, and that he could frequently twist and climb stairs, but rarely stoop or

crouch, and never climb ladders. *Id.*

In 2006 Mr. Valdez also began seeing Dr. Richard King, M.D. R 701; 704; 776–84;

1016–19; 1021–22; 1025; 1027; 1030–38; 1041–42; 1117–26; 1130–43. On September 21, 2006

Dr. King completed a Med-9 form from the Colorado Department of Social Services in which he

opined that due to Mr. Valdez's diabetes and resultant fainting episodes, Mr. Valdez was "unable

to work at any job for a total period of six or more months," and that his disability would likely

persist for at least twelve months. R. 738–39. However, on October 13, 2006 Dr. King told Mr.

Valdez that "it was fine for him to work provided he work the same shifts and did not do

excessive long shifts, more than about 8-10 hours." R. 783. Mr. Valdez was then incarcerated

from August of 2007 through December of 2009. R. 15.

In January of 2010 an examination showed discoloration on Mr. Valdez's toes. *Id.* He

did not pass a monofilament test and later that month, he had poor touch sensation in his toes

bilaterally as well as the plantar portion of his forefoot. *Id.* Mr. Valdez expressed frustration,

that he was doing everything he could to improve his diet and exercise but had not made

progress. *Id.*

A November 23, 2011 CT scan showed significant atherosclerotic disease involving the runoff vessels and femoral arteries in Mr. Valdez's left leg and less severe findings in the right leg.  R 1051.  A December 31, 2011 Aortogram showed 80 percent stenosis of the left posterior tibial artery, and that the anterior tibial artery did not communicate to the level of the ankle mortise.  R 1184.

On February 27, 2012 at Mr. Valdez's remand hearing before Administrative Law Judge ("ALJ") William Musseman (see below), Dr. Bruce Biller, M.D. testified that Mr. Valdez could perform sedentary work, and possibly light work.  R. 261–62.

In October of 2012, Mr. Valdez underwent an angioplasty of his left posterior tibial artery due to peripheral vascular disease.  R. 1229.

In 2013 another of Mr. Valdez's treating providers, Dr. Bryan Hynes, M.D., wrote a note indicating that he considered Mr. Valdez to be totally and permanently disabled.  R. 1097.  In February of 2015 Dr. Hynes completed a form indicating that when Mr. Valdez returned to work in 2013, he was limited to lifting ten pounds, sitting for three to four hours per day, and being on his feet for two to three hours per day.  R 1144–45.  He also indicated that Mr. Valdez needed to elevate his feet to waist-height for fifteen to twenty minutes three to four times a day.  *Id.*

Dr. Hynes opinion notwithstanding, in April of 2013 Mr. Valdez successfully returned to work.  ECF No. 25 at viii.

## B. Procedural Background

Mr. Valdez completed his application for SSDI and SSI on August 16, 2006.  ECF No. 25 at 7.  After SSA denied his initial application, he requested a hearing which was held before ALJ Musseman on June 17, 2008.  R. 47.  Mr. Valdez was not represented by counsel.  *Id.*  The ALJ

issued an unfavorable decision on September 5, 2008.  R. 44.  Mr. Valdez then asked the

Appeals Council to review the decision, and the Appeals Council remanded the case to the ALJ

to obtain medical expert testimony concerning plaintiff's restrictions.  R. 55–57.  A second

hearing was held before the ALJ, during which Dr. Biller testified that Mr. Valdez could perform

sedentary or possibly light work.  R. 240–64.  The ALJ issued another unfavorable decision on

March 9, 2012.  R. 63.  Mr. Valdez again requested review from the Appeals Council, but this

time his appeal was denied, on December 3, 2013, making the ALJ decision final.  R. 58.

Mr. Valdez filed a timely complaint and petition for review in the district court on

January 21, 2014.  ECF No. 1.  On April 30, 2014 District Judge Kane ordered a "sentence six"

remand of the case to the Commissioner.  ECF No 12.  Following the remand, on June 26, 2015

ALJ Kathryn D. Burgchardt issued a partially favorable decision, restricting Mr. Valdez to a

limited range of sedentary work and finding that plaintiff was disabled from November 14, 2012

through April 15, 2013.  R. 92.  Mr. Valdez appealed to the Appeals Council, alleging that the

ALJ incorrectly concluded he had amended his disability onset date to November 14, 2012.  R.

103.  In fact, plaintiff had returned to work in 2013, and amended his claim to seek a closed

period of disability benefits beginning August 6, 2006 and ending April 15, 2013.  R. 9.  The

Appeals Council remanded to the ALJ, who, after another hearing, issued an unfavorable

decision on November 27, 2017.  R. 6.  The Appeals Council denied review, and Mr. Valdez

filed a motion to reopen this case in this court on August 5, 2019.  ECF No. 17.

On September 16, 2019 Mr. Valdez submitted an opening brief.  ECF No. 25.  The

Commissioner responded to Mr. Valdez's brief, ECF No. 30, and Mr. Valdez filed a reply, ECF

No. 31.  This appeal is now ripe for review.

### C. **November 27, 2017 ALJ Decision**

In its remand order, the Appeals Council directed the ALJ to "[o]btain testimony from the claimant to establish his alleged onset date, then evaluate his claims for disability through the entire period at issue." R. 9.  The ALJ applied the SSA standard five-step evaluation process to the period of August 6, 2006 through April 15, 2013 (the "closed period") and reached an unfavorable decision. *Id.*

At step one the ALJ concluded that Mr. Valdez had not engaged in substantial gainful activity during the closed period. R. 11.  At step two the ALJ found Mr. Valdez had the following severe impairments: diabetes mellitus with peripheral neuropathy, peripheral vascular disease, and obesity. R. 12.  The ALJ also found that Mr. Valdez's impairments of hypertension and "asthma versus probably mild reactive airways disease" were non-severe. *Id.*  At step three the ALJ concluded that Mr. Valdez's impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1530(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). *Id.*

At step four the ALJ found that Mr. Valdez had a Residual Functional Capacity ("RFC") to perform "light work" as defined by 20 CFR 404.1567(b) and 416.967(b), except that Mr. Valdez could lift and/or carry less than 10 pounds frequently and up to 20 pounds occasionally. R. 13.  He could stand and/or walk with normal breaks for a total of 6 hours and sit with normal breaks for a total of 6 hours in an 8-hour workday.  He required a sit/stand option while remaining at his workstation, meaning he must have been permitted to sit/stand every 30 minutes for comfort while performing assigned duties.  He should have avoided unprotected heights and moving machinery.  He could occasionally climb ramps and stairs, stoop, crouch, kneel, and

6

crawl.  He could never climb ladders, ropes, or scaffolds, but could frequently balance.  He should have avoided extreme heat and cold.  *Id.*

In reaching this conclusion, the ALJ assigned little weight to the opinion of Dr. Alsever, given in July of 2006, who opined that Mr. Valdez could stand or walk less than two hours during an eight-hour workday and would need unscheduled breaks where he could lie down for up to two hours.  R. 17.  Dr. Alsever also concluded that Mr. Valdez could never climb ladders, but could frequently climb stairs and twist, and could rarely ever stoop.  *Id.*  Dr. Alsever concluded that Mr. Valdez would be absent from work more than 4 days a month.  R. 18.  The ALJ found this opinion both "remote in time" and "inconsistent with normal examinations shortly following this time period."  *Id.*

The ALJ assigned great weight to the opinion of Dr. King, who opined in 2006 that Mr. Valdez could work eight to ten-hour shifts.  *Id.*  The ALJ noted that Dr. King was Mr. Valdez's primary care doctor and had the opportunity to perform first-hand examinations.  *Id.*  The ALJ also found Dr. King's opinion consistent with Mr. Valdez's examination findings from that time period, which found "normal monofilament testing of his feet, full range of motion of his extremities, normal strength, normal gait, and no sensory deficits."  *Id.*

Regarding several Med-9 Colorado Department of Human Services forms completed by Mr. Valdez's providers, the ALJ found these of "limited value, since they do not describe [Mr. Valdez's] limitations in vocational terms."  *Id.*  The ALJ found that the forms also spoke to "the ultimate issue in the case, that of whether the claimant is disabled, which is an issue reserved for the Commissioner."  *Id.*  The ALJ found that these opinions were inconsistent with various examinations through the time period which revealed normal findings.  *Id.*

The ALJ assigned little weight to the opinion of Dr. Bryan Hynes, who in May of 2013 opined that Mr. Valdez was completely and permanently disabled, but in 2015 opined that Mr. Valdez could have returned to work in 2013, though he did not specify which month.  *Id.*  The ALJ found these opinions internally inconsistent and inconsistent with other examinations and the fact that Mr. Valdez did return to work in April of 2013.  *Id.*

The ALJ assigned "some weight" to the opinion of Dr. Bruce Biller, the medical expert who testified at the February 27, 2012 hearing and opined that Mr. Valdez retained the ability to perform sedentary work and possibly some light work.  *Id.*  The ALJ stated that though Dr. Biller had access to the record as it existed at the time, this did not include records following the February hearing.  *Id.*

At step five, the ALJ found that though Mr. Valdez could not perform his past relevant work as a loader operator, warehouse worker, roofer's helper, or construction laborer, there were jobs that existed in significant numbers in the national economy that Mr. Valdez could have performed during the closed period.  R. 19–20.

## ANALYSIS

Mr. Valdez asserts that the ALJ did not provide valid reasons for assigning little weight to Dr. Alsever's opinion.  ECF No. 25 at 4.  He also argues that the ALJ did not provide valid reasons for "essentially rejecting" Dr. Hynes' opinion.  *Id.* at 11.

In the Tenth Circuit, the opinion of a treating physician is entitled to controlling weight if it "is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1176 (10th Cir. 2014) (quoting *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir.

2004)) (internal quotations omitted).  "The treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations.'"  *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quoting 20 C.F.R. § 416.927(d)(2)).  "An ALJ may decline to give controlling weight to the opinion of a treating physician where he articulates specific, legitimate reasons for his decision."  *Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (quoting *Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008)) (internal quotations omitted).

### A.  Dr. Alsever's Opinion

In his notes following a July 11, 2006 appointment with Mr. Valdez, Dr. Alsever noted that Mr. Valdez was "still attempting to work as much as he can," but that Dr. Alsever believed he was "at a point where he is very limited in the kinds of work he can do.  His work should not include a great deal of bending, orthostatic changes, and should be sitting."  R. 689.  Dr. Alsever then stated that he completed a disability questionnaire for Mr. Valdez, because he felt that Mr. Valdez was "extremely compromised."  *Id.*  Dr. Alsever also completed a form titled "Diabetes Mellitus Residual Function Capacity Questionnaire."  R 685–88.  In the questionnaire Dr. Alsever indicated that Mr. Valdez could sit for two hours at a time, stand or walk for less than two hours per day, needed to take unscheduled breaks almost daily to lie down for one to two hours, and was likely to be absent from work for more than four days per month.  *Id.*  The ALJ afforded Dr. Alsever's opinion "little weight" because the opinion was "remote in time" and "inconsistent with normal examinations shortly following this time period."  R. 18.

"[I]n evaluating the medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must determine whether a treating physician's medical opinion "is conclusive, i.e., is to be accorded 'controlling weight.'" *Id.* (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). "Such an opinion must be given controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* If the opinion is deficient in any of these respects the ALJ should not give it controlling weight. *Id.*

Second, "[e]ven if a treating opinion is not given controlling weight, it is still entitled to deference." *Id.* "[T]he ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Id.*

Mr. Valdez argues that the ALJ failed to provide valid reasons for rejecting Dr. Alsever's opinion. ECF No. 25 at 6–8. SSA regulation 20 C.F.R. § 404.1527(c)(1)–(6) lists factors used in deciding the weight given to a medical opinion, which should be employed at the second step of the *Krauser* analysis. The evaluation should consider (1) whether the provider had an examining relationship; (2) whether the provider had a treatment relationship, taking into account (i) the length of the treatment relationship and the frequency of examination and (ii) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record; (5) the specialization of the provider in the area; and (6) "other factors" raised by the claimant. 20 C.F.R. § 404.1527(c).

10

As noted above, the only reasons provided by the ALJ for assigning this opinion little weight were remoteness in time of the opinion and that the opinion was inconsistent with some "normal" examinations conducted around the same time.  R. 18.  Remoteness in time is not a listed factor, but regardless, the conclusion that the opinion was too remote to be reliable makes no sense.  Dr. Alsever provided his opinion in July of 2006, roughly a month before Mr. Valdez applied for disability benefits in early August of 2006.  His opinion surely could reflect an accurate impression of Mr. Valdez's abilities at the time of his application.  *See, e.g.*, *Andersen v. Astrue*, 319 F. App'x 712, 722 (10th Cir. 2009) (unpublished) (holding that because claimant's underlying medical condition were "undisputed and permanent, the ALJ could make inferences about the progression of [claimant's] impairment, relying on earlier medical evidence," and that an opinion from October of 1997 could not be considered remote from December of 1998).

Although inconsistency of an opinion with evidence in the record is a listed factor in § 404.1527(c), the ALJ's conclusion is unsupported by substantial evidence.  The ALJ cited a "Review of Systems" conducted in April of 2007 during an emergency room visit in which Dr. Thomas Czelatdko found "Complete systems negative except for chief complaint, HPI and PMH."  R. 741.  As Mr. Valdez points out, it is not clear and the ALJ did not explain how this exam contradicts Dr. Alsever's assessment of Mr. Valdez's limitations based on his undisputed diagnoses of diabetes and vascular disease.  Indeed, this review of systems was conducted because Mr. Valdez sought emergency care for his persistently high blood sugar.  R. 740.  As further evidence of inconsistency, the ALJ cited a physical exam performed by a nurse when Mr. Valdez was seen at an emergency room for a toothache on September 13, 2006.  R 767–68.  Again, it is unclear how such an exam, performed for reasons completely unrelated to Mr.

Valdez's alleged disabling conditions, is inconsistent with the limitations articulated by Dr. Alsever.

Next, the ALJ cited notes made by Dr. King between September 14th and December 8th, 2006. R 781; 783, 785. On December 7, 2006 Dr. King notes that he saw Mr. Valdez for a "diabetic check" and reported he was experiencing low blood sugar twice a week and high blood sugar all other times. R. 781. He had an otherwise regular examination. On October 13, 2006 Dr. King noted a medication follow-up with Mr. Valdez in which Mr. Valdez reported that he had been unable to measure his blood sugar levels due to a lack of testing strips. R. 783. On September 14, 2006 Mr. Valdez saw Dr. King for another follow-up on his diabetes medication, reporting that Dr. Alsevar had changed his medication because it was elevating his blood pressure. The note states that Mr. Valdez was on "very large doses" of insulin, and that the prescription provided would "at least keep [Mr. Valdez] from going into ketosis, but we will have to adjust his insulin." R. 785. As Mr. Valdez points out, Dr. King's notes not only show that plaintiff is diabetic but also indicate that control of his diabetes continued to be problematic and required continuous treatment adjustment by his providers.

"[A]n ALJ must 'give good reasons in [the] notice of determination or decision' for the weight assigned to a treating physician's opinion." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). Inconsistency would have been a "good reason," for assigning little weight to Dr. Alsever's opinion. However, the records cited by the ALJ fail to demonstrate such inconsistency.

Mr. Valdez also argues that the ALJ failed to fully perform the two-step analysis articulated in *Krauser*. ECF No. 25 at 8. He points out that the ALJ must engage in each step of

12

the analysis and give reasons for each decision.  I agree that the ALJ opinion does not

demonstrate that she engaged in the "sequential two-step inquiry," in which each step must be

"analytically distinct."  *Krauser*, 638 F.3d at 1330.  The opinion provides two (invalid) reasons

for assigning the opinion "little weight," but it does not separately address why the ALJ declined

to give the opinion controlling weight.  R. 18.  Because the decision is deficient in its treatment

of Dr. Alsever's opinion, I reverse and remand for a proper analysis.  *Knight ex rel. P.K.*, 756

F.3d at 1177.

### B.  Dr. Hynes' Opinion

In May of 2013 Dr. Hynes wrote a note stating that "[the] patient has significant medical

illness which has him completely incapacitated and unable to hold down useful work, and I

consider him totally, completely and permanently disabled."  R. 1097.  In 2015 Dr. Hynes

completed a form indicating that before plaintiff returned to work in 2013, he was limited to

lifting ten pounds, sitting for three to four hours per day, and being on his feet for two to three

hours per day, and he needed to elevate his feet to waist height for fifteen to twenty minutes

three to four times a day.  R. 1144–45.  As Mr. Valdez points out, following the 2015 hearing in

which the ALJ mistakenly considered only the period from November 2012 to April of 2013, the

ALJ gave this opinion "substantial weight" because it was "consistent with the claimant's

treatment history for this time period showing that his medical condition needed to be

stabilized."  R. 94.

In the 2017 decision the ALJ gave Dr. Hynes' opinion "little weight," because Dr.

Hynes' opinions were "internally inconsistent with each other," and because "examinations in

2013 revealed that the claimant had intact neurological function and deep tendon reflexes as well

as normal tone and movement of all his extremities," and because "he returned to work in April

2013."  R. 18.  I agree with the ALJ.  I would not expect the ALJ to assign much weight to the

opinion of a doctor who pronounced Mr. Valdez to be totally, completely and permanently

disabled just one month before he returned to the workforce, where he has remained to this day.

The inconsistency of Dr. Hynes' opinions further detracts from their credibility.

Further, under § 404.1527(c) the ALJ could consider both internal inconsistency and

inconsistency with other evidence in evaluating Dr. Hynes' opinion.  Without examining the

other evidence, I find that the ALJ's conclusion that Dr. Hynes' opinions were internally

inconsistent was supported by substantial evidence.

But that is as far as the decision goes.  As in its treatment of Dr. Alsever's opinion, the

ALJ's opinion does not engage in the two "analytically distinct" steps articulated in *Krauser*, 638

F.3d at 1330.  *See also Guice v. Comm'r, SSA*, 785 F. App'x 565, 569 (10th Cir. 2019)

(unpublished).  Though the ALJ would have had reason to decline to assign controlling weight to

Dr. Hynes' opinion, and to assign the opinion "little weight," she was obligated to engage in the

two-step analysis.

However, this particular error was harmless.  The Tenth Circuit has found "ALJ errors of

this kind to be harmless when the ALJ made findings elsewhere in the decision that supply the

missing analysis, and the court 'could confidently say that no reasonable administrative

factfinder, following the correct analysis, could have resolved the factual matter in any other

way.'"  *Guice*, 785 F. App'x at 575 n. 6 (quoting *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733

(10th Cir. 2005)).  Here, the ALJ expressed reasoning that could have supported a two-step

analysis assigning little weight to the Dr. Hynes' opinion.  Further, for the reasons stated above,

14

any reasonable factfinder would have resolved the matter similarly.  I decline to reverse the ALJ

on her treatment of Dr. Hynes' opinion, finding she committed harmless error.

## ORDER

Because the ALJ did not properly evaluate Dr. Alsever's opinion and its significance for

the period of time during which Mr. Valdez claims to have been disabled, the Court REVERSES

the Commissioner's decision denying Mr. Valdez's application for SSI and SSDI and

REMANDS for reevaluation of the evidence in accordance with the dictates of this order.

DATED this 16th day of July, 2020.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge

15